CUMMINS-COLLINS DISTILLERIES *v.* UNITED STATES (No. 4595)

United States Court of Customs and Patent Appeals, March 1, 1949

*Joseph R. Rubin* and *Skaggs, Hays & Fahey* for appellant.

*David N. Edelstein,* Assistant Attorney General (*Richard F. Weeks,* special attorney, of counsel), for the United States.

[Oral argument December 10, 1948, by Mr. Rubin and Mr. Weeks]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Third Division of the United States Customs Court, rendered in conformity with its deci-

[1] C. A. D. 403.

sion, C. D. 1090, overruling the protest of appellant, the importer, whereby recovery is sought of monies assessed and collected by the Collector of Customs at the port of Louisville, Kentucky, on rum imported in barrels from Cuba during the period from November 6, 1943, to March 17, 1944, both inclusive.

The protest alleges, in substance, an assessment of $8,258.12 as customs duties additional to duties paid at the times of the withdrawal of the rum from bonded warehouse after being bottled, and an assessment of $19,361.40 as additional internal revenue taxes.

Thirty-one entries are embraced in the protest as it appears in the printed record before us, but it appears that the protest was dismissed by the Customs Court as to entry No. 295 with the consent of counsel for appellant. That entry is listed as covering 100 barrels of rum upon which there was assessed and paid additional customs duties of $41.22 and additional internal revenue taxes of $70.80. It is not involved in the appeal. So, the aggregate amount of the principal involved is $27,507.50, the total number of barrels of rum apparently being 4,162.

It was stipulated, as hereinafter is stated, that there were no increased duties on the rum involved in entry No. 279, which seems to have consisted of one barrel. The entry itself as it appears in the protest, however, recites an additional duty assessment of $2.56 and an additional internal revenue tax assessment of $7.80, which items are included in the $27,507.50 aggregate stated, *supra*.

Paragraph 802 of the Tariff Act of 1930, under which the customs duties were assessed, as originally passed, read:

PAR. 802. Brandy and other spirits manufactured or distilled from grain or other materials, cordials, liqueurs, arrack, absinthe, kirschwasser, ratafia, and bitters of all kinds containing spirits, and compounds and preparations of which distilled spirits are the component material of chief value and not specially provided for, $5 per proof gallon.

By the Mexican Trade Agreement, T. D. 50797, 78 Treas. Dec. 190, which became effective January 30, 1943, the rate of duty was modified, a rate of $2.50 per proof gallon being established. In addition the familiar 20 per centum Cuban preferential duty was deductible. So, the customs duty assessment on the imported rum was at the rate of $2.00 per proof gallon.

The internal revenue taxes were assessed under section 2800 (a) (1) of the Internal Revenue Code, which reads:

SEC. 2800. Tax.
(a) Rate.
(1) Distilled Spirits Generally.—There shall be levied and collected on all distilled spirits in bond or produced in or imported into the United States an internal revenue tax at the rate of $6.00 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon, to be paid by the distiller or importer when withdrawn from bond.

Proof spirits and proof gallon are respectively defined by 26 U. S. C. (1940 Edition) § 2809 (c) and (d), as follows:

(c) PROOF SPIRITS.

Proof spirits shall be held to be that alcoholic liquor which contains one-half its volume of alcohol of a specific gravity of seven thousand nine hundred and thirty-nine ten-thousandths (.7939) at sixty degrees Fahrenheit.

(d) GALLON.

In all sales of spirits a gallon shall be held to be a gallon of proof spirit, according to the standard prescribed in the preceding subsection, set forth and declared for the inspection and gauging of spirits throughout the United States.

During the trial of the case counsel for the respective parties entered into a stipulation as to the facts relating to the additional assessments which was quoted in the decision of the trial court. We here reproduce it:

Mr. RUBIN: (For plaintiff) I am offering to stipulate. The merchandise in controversy is covered by 30 entries, filed at the Port of Louisville, Kentucky, during the period of November 6, 1943 to March 17, 1944, both inclusive, and consists of a total of 4,262 barrels of rum exported from Cuba.

Mrs. BENNETT: (For the Government) So agreed.

Mr. RUBIN: At the time of entry, this rum was weighed on accurate scales and the proof thereof was determined by the use of a standard hydrometer. This was accomplished in a bonded customs warehouse, under the supervision of a United States Customs gauger, during the period of entry herein; the customs gaugers at the port of entry were not equipped to determine proof of distilled spirits by the distillation method.

Mrs. BENNETT: On the advice of the Assistant Collector at the Port of entry, the Government so concedes.

Mr. RUBIN: It has been and still is the practice at the port of entry for Customs gaugers to determine proof of imported distilled spirits by the standard hydrometer.

Mrs. BENNETT: Upon the advice of the Assistant Collector, the Government so concedes.

Mr. RUBIN: The final dates of withdrawal on the 30 entries here involved were from November 17, 1943 to and including May 1, 1944.

Mrs. BENNETT. The records of the office of the Assistant Collector of Customs so show, and the Government so agrees.

Mr. RUBIN: With the exception of entry number 279, the Collector transmitted samples for each of the entries here involved to the Customs laboratory at Baltimore, Maryland, with a request for determination of a true proof thereof.

Mrs. BENNETT: On advice of the Assistant Collector at the port of entry, the Government so agrees.

Mr. RUBIN: The results shown in the laboratory reports in the record from the Baltimore Customs chemists, represent their determination of proof of such samples by an accurate use of the distillation method; said laboratory reports may be received in evidence as collective exhibit number 1.

Mrs. BENNETT: The Government so agrees. * * *

*     *     *     *     *     *

Mr. RUBIN: Duties and internal revenue taxes paid at the times of withdrawal from the warehouse to—prior to liquidation of the entries, were based upon the proof determined by the hydrometer tests at the time of entry.

Mrs. BENNETT: On advice of the Assistant Collector, the Government so concedes.

Mr. RUBIN: Increased duties, and increased internal revenue taxes, subsequently paid pursuant to liquidation of entries were based upon the determination of proof as reported by the Customs laboratory in Collective Exhibit number 1.

Mrs. BENNETT. On the advice of the Assistant Collector, it is so agreed, except that we find there were no increased duties in entry number 279.

Mr. RUBIN: We so agree.

Mrs. BENNETT: And, no laboratory report in that entry.

Mr. RUBIN. We so agree.

Mrs. BENNETT: The Government concedes to that extent.

Mr. RUBIN. That is a complete statement of the uncontroverted facts.

Testimony was also taken on behalf of both parties. This testimony is summarized in the decision of the trial court as follows (page references of the record being deleted as indicated by asterisks):

One C. A. Boone, who was the plaintiff's auditor at the time the merchandise was entered, testified that upon arrival of the importations a local chemist was engaged to make complete analyses of the rum, including the ascertainment of proof; that the analyses disclosed that the true proof of the rum was not reflected by the hydrometer readings; and that the proof ascertained by means of the distillation method in making the analyses varied from one to three points above the proof obtained by means of the hydrometer. In view of such finding, the witness stated that the importer inquired of customs officials whether the customs tests for proofing could be made through distillation processes rather than with the hydrometer, but was advised that customs gaugers were supplied only with the hydrometer for testing purposes.

The witness further testified that the rum was bottled under the supervision of the United States storekeeper gauger employed by the Alcohol Tax Unit; that the Government furnished a hydrometer for proofing and that the rum was placed in bottles and the labels attached thereto showed the proof as was determined from such hydrometer readings. According to witness, the price at which the importer was allowed by the Office of Price Administration to sell the rum was based upon the proof shown upon the labels. And, inasmuch as the true proof had not been obtained by the Government from the laboratory at the time the merchandise was sold, the proof shown upon the labels, as required by the Federal Alcohol Administration to be specified, was less than the true proof thereof. Witness complained, therefore, that as the result of the O. P. A. limitation of profit per case to "In the neighborhood of $5.00," or "about 14 percent," * * * the importer was prevented from passing along to the consumer any increase in price caused by the levy of increased duty and internal revenue taxes when the assessments were based upon the true proof of the rum.

The witness further testified that when the rum in question was imported there was a great element of hazard in the venture for the importer for the reason that if the war suddenly ended, or the Government stopped purchasing alcohol, the market naturally would take a sudden drop and, therefore, the importer, to protect its interest, turned the rum over to the trade as soon as possible. Consequently, witness stated, the importer was not prepared to await the return of true proof from the Government laboratory before disposing of the rum, even though definitely informed that such proof was being taken. The witness insisted that the importer had accepted in good faith the duty and tax assessments upon the basis of the hydrometer proof readings and made payment upon such basis at the time of withdrawal from warehouse and, therefore, the Government is estopped from making assessments upon any other basis.

The assistant collector of customs and acting appraiser at the port of Louisville, Ky., testified upon behalf of the importer that request was made to have the rum proofed by means of the distillation method and that the request was submitted to the Commissioner of Customs who ruled that distillation tests were not practical in the field.

Concerning the practice of the collector's office in proofing spirituous liquors, the witness testified that samples of all bulk spirits are forwarded to Government chemists for analyses unless such spirits from the same producer, in the same country, and of the same brand have previously been subjected to laboratory tests and by means of distillation determined not to contain an appreciable amount of non-volatile matter.

This witness also testified on behalf of the Government that he proceeded under authority of T. D. 48809, dated February 10, 1937, section 27.43 of the Customs Manual of 1943, and chapter 13 of the Customs Gauging Manual of 1941 in forwarding the samples of the rum in question to the Government laboratory. On cross-examination he further testified that he knew of no instance where the instructions of the Commissioner of Customs to forward samples of such merchandise for laboratory tests had not been followed. He stated further that the Customs Gaugers Manual, 1941 ed., is a publication by the Government Printing Office and available for purchase by anyone desiring same.

The instructions from the Commissioner of Customs referred to, admitted in evidence as exhibit 2, are in the form of a publication which appears to have been issued by the Customs Information Exchange, New York. It sets out a communication from the Acting Commissioner of Customs to the collector at New York, evidently in reply to the collector's request for the Bureau's approval of a method of applying true proof for liquidation purposes to an entire importation of overproof spirits where such true proof differs from hydrometer tests. The Acting Commissioner in the said communication drew attention to Bureau Circular Letter No. 2284, dated January 28, 1942, wherein it was stated that in order to determine whether distilled spirits contain saccharin or other nonvolatile substances, samples of such spirits, imported in barrels, should be sent to the customs laboratory for a report as to the true proof. He added also that he was of the opinion that the Bureau's circular letter referred to should be followed whenever practicable. The pertinent portion thereof was cited in the communication of the Acting Commissioner, as follows:

Since it is not always feasible to determine whether brandy and other distilled spirits contain saccharin or other nonvolatile substances, samples of such spirits, imported in barrels or similar packages, should be sent to the customs laboratory for a report as to the true proof. This will be unnecessary, however, in the case of any brand of imported distilled spirits which is known from recent laboratory tests to show no difference between its apparent and true proof.

No further evidence was offered by either party.

An elaborate brief was filed before us on behalf of appellant arguing the case under ten headings aside from a final summarization. There is much overlapping of argument and there are inconsistencies by reason of alternative views being presented. It has not been found practicable to follow closely the exact order of appellant's arguments, but we endeavor herein to discuss to the extent necessary all points deemed in anywise material.

The brief for appellant itself states:

It is submitted that the argument advanced in Argument I are (sic) alone sufficient to overcome the determination of the lower Court, and the arguments

following are made in the alternative, and are based on the assumption (for the purpose of argument only) that Argument I above does not apply.

In the interest of clarity it may be restated at this point that when the rum was entered for warehouse it was weighed and the proof and number of wine gallons determined by use of a hydrometer; that after the gaugers had determined the number of wine gallons and proof gallons the duties estimated upon the basis of such determination were assessed and collected; and that as the entries were made the collector took samples therefrom which he transmitted to a rum customs laboratory in Baltimore, Maryland, (there being no such laboratory in Louisville) to be tested by distillation. The proof of the rum as tested by the distillation method ranged from two to three points per wine gallon above the proof shown by the hydrometer test, and in liquidating the entries, seemingly in May 1944—about two months after the date of the last entry—the additional duties here complained of were assessed and paid under protest.

Appellant's first contention, as arranged in the brief on its behalf, attacks the legality of the additional assessments. It is contended that in transmitting the samples to the customs laboratory for the application of the distillation method the collector proceeded under section 24.15, T. D. 48809, article 1378 of the Customs Regulations of 1937, dated February 10, 1937, which is quoted in the brief for appellant as follows:

The proof of distilled spirits shall be ascertained by the use of a United States hydrometer set which shall have been tested and approved by the National Bureau of Standards. Instructions relative to proofing as found in the Treasury Department Manual shall be followed.

The proof of distilled spirits *containing saccharine or other non-volatile substances*, such as whiskey blended with sherry wine, brandy and prune juice, gin and glycerine, etc., and cordials, liquors, and other spirits containing saccharine or other non-volatile substances, cannot be determined accurately by the use of hydrometers. In these cases, samples of such liquors shall be sent to a customs laboratory for a report which shall show the true proof or percentage of alcohol. (Italics supplied)

It is pointed out that the section so quoted was omitted from the Customs Regulations of 1943, and the argument is that by its omission it was superseded by the 1943 regulations, which became effective July 1, 1943. The following is quoted in the brief from the title page of the 1943 regulations:

All prior customs regulations and Marine Inspection and Navigation regulations adopted or promulgated by the Bureau of Customs which are in conflict with, or the substance of which is incorporated in, these regulations are hereby superseded, but nothing herein contained shall be construed to supersede, modify, or amend any joint regulations, or other regulations, rules, or instructions initially promulgated otherwise than as customs regulations or as the above-mentioned Marine Inspection and Navigation regulations.

It is argued on behalf of appellant that section 24.15, *supra*, which authorized samples of certain types of distilled spirits to be sent to a customs laboratory "for a report which shall show the true proof or percentage of alcohol," was voided by the 1943 regulations; that the collector had no authority to send out the samples for that purpose; and that the 1943 regulations "require" that duties and taxes be collected on the basis of the original customs gauge—that is, the hydrometer gauge. It is insisted that the hydrometer test constituted a gauging, and that it could not have been an estimation because applicable regulations require that estimation be accomplished otherwise—that is, by looking to the invoices presented with the entries.

It may be pointed out that the quotation, *supra*, from the title page of the 1943 regulations shows upon its face that only the regulations affecting customs methods were intended to be superseded; so it would seem that the omission of section 24.15, *supra*, would not affect the additional taxes assessed as internal revenue taxes, even if its omission be construed to place the 1943 regulations "in conflict with" section 24.15, *supra*,—a construction which we are not persuaded would be sound.

An analysis of section 24.15, *supra*, indicates to us that there are certain distilled spirits the true proof of which can be determined by use of a hydrometer set. These are provided for in the first paragraph of the section. The second paragraph provides for a different type of distilled spirits, rum being one of them although not identified by name, the true proof of which, it had been found by experience, could not be determined accurately by the use of hydrometers. Hence, the distillation method was provided, and we fail to see wherein a failure to repeat the specific section in the 1943 regulations brings those regulations in conflict with section 24.15, *supra*. The statement quoted from the title page, *supra*, evidently means that it was not intended to supersede any prior regulations except those with which the 1943 regulations are in conflict.

Because of certain arguments presented before us on behalf of appellant in the discussion of his first and third contentions, which we think it necessary, or at least proper, to refer to, and which appropriately may be referred to at this point, we here quote the following from the decision of the trial court:

We have examined the Code of Federal Regulations, Title 19, Vol. 5, section 24.15 (b), which refers to proofing by distillation, and which is identical with Article 1378 of the Customs Regulations of 1937, and not the omission of same in the Code of Federal Regulations, Cumulative Supplement, Book 4, Title 19. The plaintiff makes no reference to the omission of section 24.15 (a) in the latter volume. Sub-section (a) provided that proof be ascertained by the use of the hydrometer in accordance with the Customs Manual. Were plaintiff consistent, therefore, it would be further argued that the omission of section 24.15 (a) would also withdraw authority for assessment upon the basis of proof obtained with

the hydrometer and force the acceptance of the proof strength shown upon the invoices.  * * *

In response to this, it is asserted in the brief for appellant before us that before the trial court:

* * * appellant *did* argue that since the original proofing by the hydrometer was inaccurate and improper, the proof strength shown upon the invoices should have been accepted.   This argument was advanced in Argument VII in appellant's brief before the lower Court and is repeated in this brief (Argument II)   * * *. (Italics quoted.)

The brief presented before the trial court is not a part of the record before us and we have no means of knowing just how whatever argument there made (relating to the acceptance of the proof strength shown upon the invoices being accepted as estimated duties and taxes) was presented, but what may have been claimed as to the invoices in the brief below and what is claimed in the brief before us is irrelevant and immaterial for the simple reason that no claim was made in the protest that the invoice statements were binding in regard to the determination of proof strength.   We here reproduce all the protest which is pertinent upon this point:

The distinct and specific reasons for the objection thereto [i. e. the collector's liquidations made in May 1944, a little more than two months after the last entry, which were the only liquidations ever made by him] are that (1) in the case of all of such entries, proof of the distilled spirits was ascertained by the hydrometer in the first instance, which was according to Customs and Internal Revenue laws and regulations, and the Customs duties and Internal Revenue Taxes should have been determined only on the basis of such ascertainment, and (2) neither the Secretary of the Treasury nor the Collector of Customs adopted any regulations or gave sufficient notice that the proof would be determined by distillation or by any method other than by the hydrometer.
*The undersigned has acted in reliance on the determination of proof by the hydrometer.*   (Italics supplied)

It seems plain that the claim for assessment of duties and taxes upon the basis of the invoice statements was not in appellant's thought when the protest, the basis of the suit to which the trial court obviously looked and to which we must look, was filed.   It was evidently an afterthought of which appellant may not now avail itself, even assuming, without holding, that it might have done so in the protest.

We entertain no doubt that the issue here, under the protest, is limited to the matter of the hydrometer tests as against the distillation tests, and this involves the question of whether the collector exceeded his authority in securing tests, or gaugings, by the distillation method so that his act in assessing and collecting the duties and taxes complained of on the basis of the proof strength per gallon shown by such tests, or gaugings, was illegal.

All of the arguments on behalf of appellant relating to the alleged illegality of the additional duty and tax assessments complained of are

predicated solely upon regulations, there being no reference to the statutory provision hereinafter quoted.

As hereinbefore indicated, appellant's witness Boone testified to the effect that at the time of the first importation "of these entries" appellant itself engaged a private local chemist laboratory to make an analysis of a sample of the rum, including proofing same, by distillation, and it was discovered that the proof as shown by that method was from one to three points higher than the proof shown by a hydrometer which was being used by a gauger at a bonded warehouse at Athertonville, Kentucky. Later in his testimony the witness said: "This statement may not pertain to the entries in question in this case."

The witness nowhere definitely states that the collector was advised of the private analysis which appellant caused to be made, but he does state that he and the president of the company went to the local office of the collector at Louisville "to inquire as to the possibility of using the distillation method of proofing at the time of entry and upon subsequent withdrawal tax payments," and that the collector at that time advised them "that the Customs gaugers employed were not furnished with anything but a hydrometer." It appears that appellant's representative knew that samples of the involved entries were being sent by the collector's office to a laboratory, but it is not shown that they were advised of the reason for it.

We assume that it was on the basis of either the foregoing testimony of the witness Boone or that of the Government's witness Baker, that of the latter being to the effect that samples were being sent to the Baltimore laboratory, or upon both, that appellant alleged in its Arguments III and V that proofing by the hydrometer was inaccurate and, in V, that the Bureau of Customs had knowledge of that fact, and, hence, "had no right to proof the spirits, even in the first instance, with the hydrometer, not even for the purpose of the withdrawal tax payment."

All this argument seems to be advanced in support of the contention that the customs duties and internal revenue taxes should have been assessed on the spirit proof stated on the invoices, a contention not advanced in the protest.

To the same effect is appellant's Argument VI relating to the test made when the rum was bottled under Government supervision. The specific claim is that the regulations in the Customs Gauging Manual governing the bottling of distilled spirits provide that the proof "shall be determined by the hydrometer and that the proof thus determined shall be shown on the labels of the bottles." The idea expressed in the last clause of this quotation is also used by appellant in its argument relating to claimed equities hereinafter discussed.

We do not deem it necessary to pursue the arguments on behalf of appellant relative to the regulations in further detail. The trial court said, we think aptly:

\* \* \* Nor is there any point in plaintiff's argument that section 24.15 (b) was superseded by section 16.5 (d), which declares that the basis of assessment of duty shall be the quantity determined on the original customs gauge, for the reason that the contents of that section is not new in the regulations. Section 14.6 (e) of the Code of Federal Regulations, Vol. 5, Title 19, is reprinted as section 16.5 (d) in substantially the same language in the Cumulative Supplement of the Code of Federal Regulations and also in the Customs Regulations of 1943.

Aside from all that is said, or that might be said, concerning the regulations, we agree with the trial court that pargaraph 811 of the Tariff Act of 1930 is conclusive of the validity of the action of the collector (who proceeded, as we understand it, under special instructions issued by or under the authority of the Secretary of the Treasury) in sending samples to the customs laboratory for distillation tests and in accepting, for customs and internal revenue tax purposes, as the legal gauge, the proof shown by the distillation process. That paragraph reads as follows:

PAR. 811. Each and every gauge or wine gallon of measurement shall be counted as at least one proof gallon; and the standard for determining the proof of brandy and other spirits or liquors of any kind when imported shall be the same as that which is defined in the laws relating to internal revenue. The Secretary of the Treasury, in his discretion, may authorize the ascertainment of the proof of wines, cordials, or other liquors and fruit juices by *distillation or otherwise*, in cases where it is impracticable to ascertain such proof by the means prescribed by existing law or regulations. (Italics supplied)

The paragraph is complete in itself. It does not require any general regulations for its enforcement and it, of course, would be superior to any regulation inconsistent with its provisions.

It seems to us that appellant's contentions respecting the matter of the alleged illegality of the collector's action all along has been based upon the erroneous theory that the original hydrometer test (or that plus the hydrometer test applied when the rum was bottled, the latter seemingly being the basis upon which the estimated duties and taxes were paid) constituted a gauging for duty and tax purposes and that legally there could be no other gauging for that purpose.

We are unable to agree to any such theory. Obviously, it was the intent of Congress that customs duties and internal revenue taxes should be paid on the true proof strength of distilled spirits, and that that proof should be obtained by the most accurate method available. To those ends it not only authorized regulations, but itself enacted a self-sufficient statute. Appellant here was charged with knowledge of the regulations and the statute. Moreover, in this case appellant knew from an analysis which it, of its own volition, caused to be made that the distillation method disclosed a higher proof than the

hydrometer method, and it never questioned the accuracy of the proof shown by the distillation method.

The arguments on behalf of appellant relating to claimed equities which it is urged should lead to a judgment in its favor were so presented to the trial court that it was led to say:

The numerous contentions of the plaintiff seem to be geared primarily to the equities of the imposition of duties and taxes upon the imported rum, and secondly to the legality of such assessments. If the only question involved were equitable relief for the plaintiff, and if this court had jurisdiction over same, the contentions of the plaintiff might be tenable. But it has long been held, however, that this court is a court of the United States of limited and special jurisdiction and without equitable jurisdiction. See *Julius C. Wolff (Inc.)* v. *United States*, 58 Treas. Decs. 404, T. D. 44310; *A. Jimeno et al.* v. *United States*, 2 Cust. Ct. 58, C. D. 87; *Harry A. Liebler* v. *United States*, Abstract 20022.

In the brief before us it is argued, in substance, that the rum market at the time the involved entries were made was such as to make it imperative to sell the rum immediately after the entry; that appellant acted in good faith, doing everything it could to have the original customs gauge "properly taken by the distillation method;" that during the period when the involved transactions took place the ceiling price at which the importer could sell the rum was "fixed by Government regulations, the price including the duties and taxes determined by the hydrometer method, as stamped upon the bottle labels, wherefore appellant was unable to pass on to its customers the additional duties and taxes based upon the distillation gauge assessed and paid after it had withdrawn the bottled rum and paid the duties and taxes based upon the hydrometer test; and that it is an injustice to compel appellant to pay such additional duties and taxes now inasmuch as they cannot be recovered from those who purchased the rum.

The condition of the rum market (and it is a fair assumption that the condition as to other distilled liquors was generally the same) during the period referred to is described in the testimony of appellant's witness as follows:

The market on imports at that time were [sic] entirely dependent on the regulations and requirements of the Defense Supplies Corporation, with whom we had a contract to produce for the Government alcohol and high wines. No importer of distilled spirits during that period could afford to warehouse such imports for a period any longer than it took to withdraw bottle and sell same imports. No one knew when the war was going to be over or when the Government would have enough stock pile of alcohol for them to release the distillers from further production for the war effort. Because of that fact, Cuban imports such as the one we handled, were strictly dynamite and we endeavored at all times to maintain as small an inventory as possible; in other words, not to be caught short if Government regulations and requirement relaxed.

It is a fair presumption that the officials and representatives of appellant were entirely familiar with the conditions described before the orders for the rum were even placed with the Cuban exporters.

They are not shown to have been caught unawares or taken by surprise. They deliberately took the hazard involved in uncertain market conditions generally familiar to the entire public. It chose to make a quick turnover of the rum, even though its officials knew from investigations initiated by themselves that the duties and taxes which they actually paid were based upon a test which disclosed a lower proof than had been disclosed by a different test which latter the statute, to say nothing of the regulations, expressly sanctioned. We are not, therefore, particularly impressed with the contentions respecting appellant's equities even if we had jurisdiction similar to that of a court of equity which we have not in customs and internal revenue cases that are governed by statutory law.

The last argument before us, other than such as is embraced in the summarization, is predicated upon a statute approved June 8, 1948, which, therefore, was not in existence at the time of the trial court's decision and judgment in this case on March 11, 1948, and so was not involved in its decision. The act is Public Law 612, 1 U. S. Code Congressional Service 359. The brief for appellant refers to it as Chapter 425, 2d Session of the 80th Congress. It is amendatory of paragraph 813 of the Tariff Act of 1930, which is the "breakage, leakage or damage" paragraph of schedule 8 of that act relating to spirits, wines, and other beverages.

The first paragraph of the amendatory act reads:

PAR. 813. Notwithstanding any other provisions of this [the Tariff Act of 1930] Act, the duties imposed on beverages in this schedule which are subject also to internal revenue taxes shall be imposed only on the quantities subject to such taxes.

The second paragraph relates to the time when the amendment became effective.

Upon the basis of the facts of this case we fail to discern the applicability of the amendment here. No customs duties were imposed on any quantities of the rum involved not subject to internal revenue tax.

It may be stated that there is nothing in the record before us indicating any bad faith or improper conduct on the part of appellant, but, unfortunately for it, upon the facts appearing, it has no legal right to the recovery sought.

The judgment of the United States Customs Court is *affirmed*.